Magistrate Judge Arnold

FILED ____ LODGED
_____ RECEIVED
JUN 27 2013
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

UNITED STATES OF AMERICA,

    Plaintiff

v.

DURIEL R. SMITH,

    Defendant.

NO. MJ13-5136

COMPLAINT FOR VIOLATION of

18 U.S.C. § 2241(a)

BEFORE J. Kelley Arnold, United States Magistrate Judge, U. S. Courthouse, Tacoma, Washington.

## COUNT 1
### (Aggravated Sexual Abuse)

On or about July 13, 2012, in Pierce County, within the Western District of Washington, within the boundaries of Joint Base Lewis-McChord, an area within the special maritime and territorial jurisdiction of the United States, the defendant, DURIEL R. SMITH, did knowingly cause a victim, known as "Adult Female," to engage in sexual acts, to wit, contact between the penis and vulva and the penis and mouth, by the use of force and by placing the victim in fear that she would be subjected to death, serious

COMPLAINT / SMITH - 1

bodily injury and kidnapping, in that the defendant placed a knife to Adult Female's throat.

All in violation of Title 18, United States Code, Section 2241(a).

The undersigned complainant, MATTHEW SCOTT, being first duly sworn on oath, does depose and say:

## INTRODUCTION

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), assigned to the Tacoma Resident Agency, of the Seattle Field Office, Washington. I have been an SA with the FBI for nine years. During this time, I have investigated violations of the federal statutes governing wire and mail fraud, mortgage fraud, bank robbery, violent crime and narcotics trafficking. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 1961(6); that is, an officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Chapter 96.

2. This affidavit is made in support of a complaint charging DURIEL SMITH with violation of Title 18, United States Code, Section 2241 (a) (Aggravated Sexual Abuse), which had been committed by SMITH. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement agents/officers, and witnesses. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of this complaint, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## SUMMARY OF INVESTIGATION

3. On July 13, 2012, at approximately 3:47 a.m., the victim, Adult Female (hereinafter "A.F."), reported to military guards that she had been raped by an unknown assailant near the intersection of 41st Division Drive and San Francisco Avenue, in the North Fort area of Joint Base Lewis-McChord (JBLM).

4. On the evening of July 12, 2012, A.F. had been on post visiting an enlisted friend (hereinafter "E.M.") and woke up sometime between 2:00 a.m. and 2:40 a.m. to walk towards the North Fort Gate where another friend (hereinafter "T.V.") was waiting to pick her up. According to A.F., as she walked along the roadside of 41st Division Drive, she noticed a black male, wearing a grey hooded sweatshirt and blue jeans, walking on the opposite side of the road. The male then crossed the road and proceeded to walk behind her. A.F. became uncomfortable, crossed the road, and called a third friend. When A.F. looked back, she saw the male subject running towards her with a knife. She screamed and dropped her phone.

5. Continuing on July 13, 2012, the male subject put a knife to A.F.'s throat and forced her into the woods off of 41st Division Drive. The unknown male made A.F. take off her clothes, including her leggings and underwear, forced her to perform oral sex on him, and then raped her vaginally. A.F. indicated to investigators that she told him "no, please don't hurt me" and "please don't do this," but did not try to escape or fight back because she feared the male would kill her with the knife. After approximately five to ten minutes, the male fled the scene, running in the direction from which he had followed A.F. A.F. proceeded to the North Fort Gate and reported the incident to the gate guards.

6. A.F. provided a description of the male to a gate guard, indicating that he was approximately five feet, seven inches tall, African-American, with about a one inch afro-style haircut, and wore a gray hooded sweatshirt, blue jeans and white shoes. A.F. reported that, during the assault, the assailant had his sweatshirt hood up.

7. In a subsequent interview on July 13, 2012, A.F. again stated that the male told her to go to the woods, and she listened to him because she was scared. A.F. told her attacker not to hurt her, and he responded that he wouldn't hurt her if

COMPLAINT / SMITH - 3

she had sex with him. A.F. stated the perpetrator appeared and sounded young, about 18 to 20 years old, was skinny, and approximately five feet, eight inches tall. During the course of the attack, the perpetrator told A.F. that he lived on post with his family and asked for her phone number, which she provided and he entered into a black and white flip-style phone.

8. A.F. described the knife used by her attacker as a silver pocket knife, perhaps a switchblade, and made a folding motion when describing the knife to investigators.

9. A.F. described the area where she was taken as a woody area with lots of trees, near a light pole, and close enough to the road that she could still see the road, but doubted people could see her from the street. A.F. did not believe the perpetrator wore a condom and was unsure if he ejaculated.

10. After the assault, A.F. returned to the street, found her phone, put the phone back together, and contacted the friend she had called when she first noticed her attacker following her.

11. A.F. drafted a sketch of the route she took from the barracks, including taking a shortcut through the parking lot of the North Fort Lewis Shoppette, to the location of the sexual assault, marking off the areas where she first saw the unknown male and then where the incident occurred. On July 13, 2012, at approximately 5:45 a.m., law enforcement conducted a crime scene examination of a wooded area approximately 150 meters northwest of the intersection of San Francisco Avenue and 41st Division Drive, JBLM. The search did not reveal anything of evidentiary value.

12. A.F. told investigators that earlier in the night, while visiting E.M., she and E.M. had sexual intercourse, and that they had used a condom. E.M.

confirmed the same information. A DNA sample from E.M. was collected with his consent in October 2012 using the buccal swab method.

13. Continuing on July 13, 2012, a nurse practitioner at Providence Palliative Care, Providence Saint Peter's Hospital in Olympia, Washington, conducted a sexual assault examination of A.F. and indicated that A.F. had abrasions on her left thigh and a tear in her genital area, which was documented on a Sexual Assault Report Form.

14. Law enforcement interviewed A.F.'s friend, T.V., who was scheduled to pick up A.F. at 3:00 a.m. on July 13, 2012. T.V. indicated that she had called A.F. at approximately 2:41 a.m. and told her to start walking to the North Gate. A.F. indicated to T.V. that she was on her way, but when T.V. called A.F. at approximately 3:00 a.m., A.F. did not answer. T.V. called A.F. approximately eight times between 3:00 and 3:40 a.m. and sent approximately three text messages between 3:21 a.m. and 3:25 a.m., asking A.F. why she didn't pick up and her location. A.F. did not respond to the text messages. T.V. sent a final text message telling her she would be at the Visitor's Center waiting for her.

15. A review of video footage dated July 13, 2012, from the North Fort Lewis Shoppette, which is located near the crime scene, shows an unknown black male wearing a grey hooded jacket, light-colored blue jeans, and white athletic shoes. These items match the description of the clothes worn by A.F.'s attacker. The unknown male appears on the video from 2:32 a.m. to 2:34 a.m. and again from 2:54 a.m. to 2:58 a.m.

16. In a December 2012 interview with investigators, the gate guard, CPL Eric Brodie, who first encountered A.F. on July 13, 2012, when she walked towards the gate house in the middle of the outbound lane stated that A.F. described her assailant as "nice" and that he had asked for her phone number. CPL

Brodie stated that A.F. did not seem upset and was not crying when she reported the attack to him. He further stated that A.F. appeared to him to want to report the crime and leave. CPL Brodie indicated that A.F. returned the next week to obtain a pass to visit E.M.

17. In August 2012, law enforcement compiled a list of dependents listed as residents in the area and who matched the age range of the suspect described by A.F. After a review of photographs of the identified dependents, eight were determined to meet the general description, including SMITH, who is an African-American male and was 18 years old at the time.

18. Law enforcement conducted a social media search for SMITH, revealing a Facebook entity for "Duriel Blownqqloud Smith," who was connected to SMITH's mother, an enlisted soldier with whom SMITH lives in the Beechwood area of JBLM. A search of the list of Facebook friends for the "Duriel Blownqqloud Smith" account revealed that he was friends with "A.F.," the rape victim.

19. In September 2012, law enforcement conducted a photo lineup with A.F. A.F. stated that the photograph of SMITH looked familiar from the nose down; however, since it was so dark and he was wearing a hooded jacket at the time of the incident, she could not be sure.

20. Law enforcement informed A.F. that she was friends with SMITH on Facebook, and requested she log onto her Facebook account to determine when they "friended" each other and what, if any, communication they may have had. A search of A.F.'s Facebook account revealed she has been friends with SMITH since August of 2011. Since the assault, A.F. stated she never met with SMITH offline or communicated with him online or offline. A.F. stated she had not received any calls from an unknown or blocked number since the incident.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

21. On November 8, 2012, Special Agent (SA) Samuel Jeffers, 44th Military Police Detachment (CID), interviewed SMITH, who, after being advised of his rights, repeatedly denied any wrong-doing or association with the above-described events. SA Jeffers noted that SMITH was five feet, eight inches tall, about 120 pounds, skinny, and his hair was about an inch off of his head.

22. During the interview on November 8, 2012, SMITH denied sexually assaulting A.F. or anyone else. SMITH repeatedly denied knowing A.F. and had no explanation for why he was Facebook friends with A.F. SMITH indicated that he did not know everyone he was friends with on Facebook and reiterated that he did not know A.F. SMITH further stated that he generally does not leave his house, which is located in the Beechwood housing area, at night. At the time, he had lived at that residence for nearly a year and indicated that he is home with his son during the night.

23. Based on my knowledge and experience, I know that users of Facebook have friends "suggested" to them by Facebook itself. This is true of Facebook users with a similar network of friends, interests and other similar demographics, including geography and age, who, when friends are "suggested," need only to push a button to send a friend request. Accepting a friend request is also as simple as clicking a button.

24. Prior to questioning SMITH on November 8, 2012, SA Jeffers noted that SMITH appeared to be under the influence of an intoxicant. When confronted, SMITH admitted he had smoked marijuana before coming to the CID office. SMITH was given three hours to allow the effects of the marijuana to wear off before the aforementioned statement was given. Prior to questioning, SMITH stated that he was no longer under the influence of marijuana and SA Jeffers noted that SMITH's eyes were no longer bloodshot.

25. SMITH refused to consent to provide a DNA sample at the time of questioning. Continuing on November 8, 2012, SA Jeffers talked with Captain (CPT) Sean Flood, part-time military Magistrate, JBLM, and briefed him on all aspects of this investigation. CPT Flood provided verbal authorization to collect a DNA sample of SMITH and to search his residence located on Trenton Avenue, JBLM, to search for and seize controlled substances and related evidence.

26. On November 8, 2012, a DNA sample was collected from SMITH using the buccal swab method. Two swabs were placed in the collection kit and taken into evidence. SMITH's DNA sample was later analyzed and matched against DNA profiles found on A.F. as a result of her sexual assault examination, as described in paragraph 28, below.

27. During the authorized search of SMITH's residence on November 9, 2012, law enforcement found a black and white flip-style phone found in SMITH's bedroom. This phone matched the description of the phone in which A.F.'s attacker entered her phone number. No SIM card was contained in the phone. According to his sister, SMITH had used such a phone until about a month prior November 2012, when he started using an iPhone. CPT Flood provided authorization to seize the phone and place it into evidence.

28. Laboratory testing was conducted on DNA samples collected from A.F. during her July 13, 2012, sexual assault examination referenced above and a subsequent buccal swab collection and on DNA obtained from SMITH and E.M. The tests revealed that a DNA profile from semen obtained from the vaginal swab and vulva/external swab of A.F. positively matched the DNA profile of SMITH. The frequency of occurrence of this DNA profile among unrelated individuals selected at random from the U.S. population for African-Americans is one in 22 quintillion (22,000,000,000,000,000,000). Despite his denials regarding the above-

described incident, SMITH's DNA was present in semen recovered from A.F. during an exam shortly after the attack.

## CONCLUSION

29. Based on the foregoing information, I respectfully submit that there is probable cause to believe that SMITH engaged in activities in violation of Title 18, United States Code, Section 2241(a) (Aggravated Sexual Abuse).

_____
Matthew Scott, Complainant
Special Agent
Federal Bureau of Investigation

Based on the Complaint and Affidavit sworn to before me, and subscribed in my presence, the Court hereby finds that there is probable cause to believe the Defendant committed the offenses set forth in the Complaint.

Dated this 27th day of June, 2013.

_____
The Honorable J. Kelley Arnold
United States Magistrate Judge

COMPLAINT / SMITH - 9

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800